UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAVANNAH NASH,

        Plaintiff,                                      Case No. 14-11725
                                                          Honorable Thomas L. Ludington

v.

ACSO OF MICHIGAN, INC.,

        Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**

Plaintiff Savannah Nash (Nash) brought this action against her former employer, ACSO of Michigan, Inc. (Cash Advance), alleging that Cash Advance unlawfully terminated her employment. On May 7, 2014, Cash Advance filed a motion to dismiss Nash's one–count complaint, arguing that she was an at-will employee who could be terminated at any time. There is no language in Cash Advance's contract with Nash, or any other policy documents, that would justify a legitimate expectation of just–cause employment. Nash's complaint will be dismissed.

**I**

**A**

On August 4, 2011, Cash Advance hired Nash as a part–time employee at Cash Advance Center #1380 in Saginaw, Michigan. In April 2013, Divisional Director of Operations Richard Currie promoted Nash to Assistant Manager at a separate Cash Advance location (Cash Advance Center #1361). Then on May 25, 2013, Sophia Duron was appointed as the new manager of Center #1361. Duron was a part–time student in addition to managing Center #1361; her class schedule prevented her from working on Saturdays. As a result, Nash was told she would be

required to work every Saturday because Duron was unavailable.  On March 26, 2013,[1] Nash notified Duron—and separately Currie—that this arrangement would not work for her because she had childcare obligations.  Pl.'s Compl. ¶ 17, *attached as* Def.'s Notice of Removal Ex. A.  Despite her protest, Nash was informed on May 1, 2013, that she would be scheduled every Saturday.

Nash nevertheless persisted and spoke with Duron and Currie separately, explaining that it was unfair to force her to accommodate the newly–appointed manager's school schedule.  Currie indicated that he would attempt to ensure Nash's schedule had at least two Saturdays off each month.  *Id.* ¶ 22.  Despite this statement, during a conference call between Nash, Duron, and Currie on May 3, 2013, Currie told Nash that she would still have to work every weekend based on "company needs."  *Id.* ¶ 23.  Nash disagreed and noted that she was also uncomfortable with the hostility of the call.  *Id.* ¶ 24–25.

On May 31, 2013, Nash called in sick for work.  Subsequently, on June 2, 2013, Currie and Duron summoned Nash to a meeting where she was told she had a "bad attitude" and "poor attendance."  *Id.* ¶ 27.  As a reprimand for that alleged conduct, Nash was presented with a counseling form, which she was asked to sign.  Nash protested and refused to sign the form.  She subsequently took her objection to David Booth, Currie's supervisor.  Booth cleared Nash to return to work on June 26, 2013, and decided that she had a right to refuse to sign her counseling form.

---

[1] The reader will note that the dates appear to be inconsistent: According to Nash's pleadings, Duron was appointed manager of Center #1361 (May 25, 2013) three weeks after Nash was informed she would have to work every weekend (May 1, 2013) and two months after Nash notified Duron and Currie that she could not do so (March 26, 2013).  It is presumable that Nash meant to indicate Duron was appointed the new manager on *March* 25, 2013, as then all the other dates would make sense.  However, neither party disputes these given dates, so they are included as found in the pleadings.

When Nash returned to work on June 26, 2013, she claims that she was treated with hostility. So that same day she lodged complaints concerning a hostile work environment with Human Resources. As a result of her complaint, Nash again met with Booth, who agreed to transfer her back to Center #1380, effective August 12, 2013. Booth explained that the transfer would mean a demotion from the position of Assistant Manager, but that Nash would be able to keep her current pay. *Id.* ¶ 34. Notwithstanding Nash's relocation, Duron believed that Nash would still have to cover Center #1361 for the Saturday shift on August 21, 2013. Nash disagreed. Instead, she claimed that she was scheduled to have that day off. Presumably because of this disagreement (although not outlined by either party), Currie subsequently terminated Nash for "insubordination" on August 16, 2013. *Id.* ¶ 38.

**B**

Cash Advance provides every employee with its Code of Business Conduct and Ethics (Code), as well as an Employee Handbook (Handbook), receipt of which employees acknowledge by signing a disclaimer. The Handbook disclaimer asks each employee—in bold–face print—to acknowledge (among other things) that the Handbook's terms do not create a contract, that each employee is employed at–will (with the ability to leave or be fired at any time, for any reason), and that the only valid employment contract is one that is in writing and signed by the Company President. *See* Handbook 2, *attached as* Pl.'s Resp. Ex. B, ECF No. 6. Likewise, the Code has similar provisions that make clear the terms included therein do not in any way constitute an employment contract or an assurance of continued employment. *See* Code 1, 19, 20, *attached as* Pl.'s Resp Ex. A.

Nash alleges that when Cash Advance terminated her employment, it violated five provisions contained in the Handbook or the Code. *See* Handbook at 40; Code at 1, 11, 13.

These provisions concern Cash Advance's open door policy, a conflict of interest policy, "Responsibility to Our People" policy, responsibility for harassment policy, and a policy concerning retaliation for making complaints or reports. *Id.* ¶ 39(a)–(e). Nash claims that the reasons for her termination were "wholly pretextual and were retaliatory by Mr. Currie" in violation of Cash Advance's Handbook and Code.

**C**

Nash filed a complaint on March 31, 2014, in the 10th Circuit Court of Saginaw County, but her complaint was removed by Cash Advance to this Court on April 30, 2014. Nash claims that her termination, which violated the above–mentioned policies, caused her to "lose her job, back pay, future pay, future raises, and all other benefits provided and forced her into unemployment, which caused her severe economic damages." *Id.* ¶ 45. She also seeks costs, interest, and attorney's fees.

Cash Advance filed a motion to dismiss Nash's complaint on May 7, 2014, alleging that Nash—like all other Cash Advance employees—was an at–will employee and could be terminated at any time for any reason. Def.'s Mot. 2, ECF No. 4. Accordingly, it contends that Nash's complaint for unlawful termination does not assert a claim for which relief can be granted. *Id.* Further, Cash Advance alleges that Nash's claims are frivolous and interposed simply for harassment. *Id.* at 3. According to Cash Advance, this is evidenced by Nash having attached its Code and Handbook—documents that are clearly identified as confidential and proprietary—to her pleadings without taking any protective measures. *Id.*

Nash responded to Cash Advance's motion on May 13, 2014. Though she agrees that her contract with Cash Advance—and the policies that she agreed to—include numerous indications that her employment arrangement was considered at–will, Nash contends that a presumption of

at–will employment can be rebutted by showing that an employer's policies or procedures instilled a legitimate expectation of job security. Nash emphasizes that Cash Advance violated a number of policies that created such a legitimate expectation concerning her own employment.

## II

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted)). A claim is plausible when the plaintiff pleads factual content sufficient to draw the reasonable inference that the defendant is liable for the conduct alleged. *Iqbal*, 556 U.S. at 678. When determining whether a plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true. *Twombly*, 550 U.S. at 570.

Relevant to this action—claims involving implied employment contracts—Michigan courts have held that an employer's policy statements, contained in manuals and personnel policies, can create grounds for wrongful termination. *Toussaint v. Blue Cross Blue Shield of Michigan*, 292 N.W.2d 880, 885 (Mich. 1980).

## III

Michigan law presumes that "employment relationships are terminable at the will of either party." *Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998) (citing *Lynas v. Maxwell Farms*, 273 N.W. 315 (Mich. 1937)). In order to rebut the presumption of at–will employment, Nash must demonstrate either a "contract provision for a definite term of employment, or one that forbids discharge absent just cause." *Lytle*, 579 N.W.2d at 911 (citing *Rood v. Gen.*

*Dynamics Corp.*, 507 N.W.2d 591 (Mich. 1993)). The Michigan Supreme Court has explained that this contract–provision requirement can be satisfied in three different ways: (1) proof of a definite term or definite provision forbidding discharge absent just cause; (2) a clear and unequivocal express agreement precluding discharge absent cause; or (3) an implied contractual provision where an employer's policies and procedures instill a legitimate expectation of job security in the employee. *Lytle*, 579 N.W.2d at 911.

Here, Nash does not proffer definite terms or provisions forbidding her termination absent just cause, nor does she allege that she maintained a similarly–restrictive, clear and unequivocal express employment agreement with Cash Advance. Instead, Nash stakes her claim on the theory that Cash Advance's policies and procedures created a legitimate expectation of job security.[2] In *Rood*, the Michigan Supreme Court explained the basis for "legitimate expectations" claims:

> [T]he legitimate expectations theory . . . is not based on traditional contract analysis. The rationale for Judicial enforcement of employer policies and procedures relating to employee discharge is simply the intuitive recognition that such policies and procedures tend to enhance the employment relationship and encourage an orderly cooperative and loyal work force for the ultimate benefit to the employer.

*Rood*, 507 N.W.2d at 606. This type of claim is often referred to as a "*Toussaint* legitimate expectations theory" based on the Michigan Supreme Court's decision in *Toussaint*. *Id.*

In *Toussaint*, an at-will employee who was told he would be with his company "as long as [he] did [his] job" was later fired without just–cause. *Toussaint*, 292 N.W.2d at 890. The issue concerned addressing an employment agreement in the absence of an explicit, definite contract. The Michigan Supreme Court consulted the company's policy statements, where it

---

[2] Nash also alleges in her complaint that Cash Advance breached its contract with her. Cash Advance addressed this issue in its motion to dismiss, as well as Nash's "legitimate expectations" claim. Nash's response, however, does not address the breach of contract claim, nor does she indicate any contractual terms on which such a claim could rely. Accordingly, Nash's complaint, inasmuch as it pleads a breach of contract claim, will be dismissed.

discovered that the company expressly included a provision that it would not terminate employees without good cause. *Id*. Even though it was not contained in an employment contract, the *Toussaint* court held that this provision created a legitimate expectation in the employee that he was "just–cause" rather than "at–will," and therefore he was not subject to termination absent good cause. *Id.* Under *Toussaint* and its progeny, the legitimate expectations theory "operates as a viable, independent basis for enforcing promises of job security contained in policy statements that are circulated [to the general workforce]." *Cole v. Knoll, Inc.*, 984 F. Supp. 1117, 1130 (W.D. Mich. 1997) (quoting *Rood*, 507 N.W.2d at 607).

In order to evaluate legitimate–expectations claims, the Michigan Supreme Court applies "a two–step inquiry." *Lytle*, 579 N.W.2d at 911. The first step "is to determine, what, if anything, the employer has promised." *Rood*, 507 N.W.2d at 606. A "promise" is defined as a "manifestation" of intention to act or refrain from acting in a specified way, so as to justify an understanding that a commitment has been made. *Id.* (quoting *Restatement (Second) of Contracts* § 2(1) (1981)). The second step "is to determine whether the promise is reasonably capable of instilling a legitimate expectation of just–cause employment in the employer's employees." *Rood*, 507 N.W.2d at 607.

The Michigan Supreme Court observes that "not all policy statements will rise to the level of a promise." *Id.* Moreover, the court cautions that "only policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Id.* Accordingly, "in all claims brought under the legitimate expectations theory of *Toussaint*, the [court] should examine employer policy statements, concerning employee discharge, if any, to determine, as a threshold matter, whether such policies are reasonably capable of being interpreted as promises of just–cause employment." *Id.*

- 7 -

In *Heurtebise v. Reliable Business Computers, Inc.*, 550 N.W.2d 243 (Mich.1996), for example, an employee handbook contained a provision that arguably created an enforceable arbitration agreement between the employer and its employees. *Id.* at 247. The Michigan Supreme Court concluded, however, that the provision did not create a contract because the employer reserved the right to modify the policies contained in the handbook at its sole discretion. *Id.* at 247. Specifically, the handbook provided:

> [Handbook] Policies will apply to all company employees, and it is each employee's responsibility to assure that his/her own conduct is in conformity with those Policies. It is important to recognize and clarify that the Policies specified herein do not create any employment or personal contract, express or implied . . . . From time to time, the company specifically reserves the right, and may make modifications to any or all of the Policies herein, at its sole discretion, and as future conditions may warrant.

*Id.*; *see also Mills v. United Producers, Inc.*, 11-13148, 2012 WL 3870220, at *18 (E.D. Mich. Sept. 6, 2012). The Michigan Supreme Court emphasized that these disclaimers "demonstrate[d] that the defendant did not intend to be bound to any provision contained in the handbook." *Heurtebise*, 550 N.W.2d at 247; *see also Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 316 (6th Cir. 2000) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect destroys the promise and makes it merely illusory." (quoting 1 Samuel Williston, *Contracts* § 43 (3d ed.1957)). As a result, the *Heurtebise* court concluded that the handbook in question could not reasonably be interpreted as constituting a promise of just–cause employment, and the plaintiff's claims were dismissed.

In *Toussaint*, by contrast, the Michigan Supreme Court held that a reasonable juror could conclude that the employee handbook in question created an enforceable promise of just-cause employment because the handbook contained an express "discharge-for-cause-only" policy

statement. 292 N.W.2d at 893. Specifically, the handbook promised "to provide for the administration of fair, consistent and reasonable corrective discipline" and "to release employees for just cause only." *Id.* (brackets omitted). The Michigan Supreme Court concluded that "employees could justifiably rely on those expressions." *Id.*

In this case, Cash Advance's Handbook and Code are more akin to the handbook in *Heurtebise* than that in *Toussaint*. The Handbook Nash received contains the same two substantive disclaimers as the handbook in *Heurtebise*:

> The contents of this Handbook are not intended to and do not create a contract, either expressed or implied, between the Company and any Employee . . . These guidelines may be modified, amended, discontinued or cancelled by the Company at any time in its discretion with or without notice.
>
> As an Employee, you are employed at–will and are completely free to leave the Company at any time you choose, and the Company has the same right to end the employment relationship at any time for any reason or for no reason, with or without notice. Nothing in this Handbook binds the Company or any Employee to a specific or definite period of employment or to any specific policies, procedures, benefits, working conditions, rules or privileges of employment.

Handbook at 2. The plain language of this policy statement expressly and unambiguously provides that Nash's employment relationship was terminable at the will of either party.

Similarly, the Code provides that it is a statement of the fundamental principles, policies, and procedures of Cash Advance; it "does not create any obligation to or rights in any [employee]." Code at 19–20. The Code further explains that Cash Advance employees are "employed at–will, except when covered by an express, written employment agreement." *Id.* at 1. Nash makes no claim that she had an express, written employment agreement providing for just–cause employment. Accordingly, the plain language of the Code also expressly and unambiguously provides that Nash's employment relationship was terminable at the will of either party.

The Michigan Supreme Court instructs, "[a]n express policy that disclaims any contractual intent certainly requires a plaintiff-employee to explain why a case is reasonable and legitimate despite an express disclaimer." *Lytle*, 579 N.W.2d at 913 n.17. Indeed, "[w]hile courts should review handbook provisions in their contexts, in most instances express disclaimers of contractual intent will foreclose legitimate–expectation claims, given the difficulty of proving such reasonable and legitimate expectations." *Id*. Nash has not demonstrated that the Handbook or Code she received created a legitimate expectation of just–cause employment in light of the express disclaimers she signed, and the other relevant provisions contained in the Code and the Handbook. Because they are contained in the Code or Handbook (and not some other express contract between Cash Advance and Nash), the open door policy, along with the other provisions she cites, cannot reasonably be interpreted to confer contractual rights.

IV

In its motion to dismiss, Cash Advance also alleges that Nash's claim is frivolous and interposed to harass in violation of Federal Rule of Civil Procedure 11. Def.'s Mot. ¶ 11. It contends that this is evidenced by Nash including with her pleadings the Code and Handbook—which are identified as confidential and proprietary—without taking any protective measures to safeguard the information they contain. *Id*. Nash contends that she has submitted facts that support a finding that Cash Advance breached the Code and retaliated against her, and so the lawsuit is not frivolous. Pl.'s Resp. 15.

The test for the imposition of Rule 11 sanctions is whether the attorneys' conduct was objectively reasonable under the circumstances. *Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F2d 1224, 1229 (6th Cir. 1989). As stated above, this claim required an analysis of the *Toussaint* legitimate expectations theory. Under this theory, courts consider

employer policies to determine whether they could be construed to create an implied employment agreement beyond at–will employment. *Rood*, 507 N.W.2d at 606.

Some Michigan Courts have held that a justifiable belief that employment was at–will can arise even if policies otherwise define the arrangement as at–will. *See Langeland v. Bronson Methodist Hosp.*, 444 N.W.2d 146, 148 (Mich. Ct. App. 1989) (concluding that although provisions in the employee code expressly indicated that employment was "at–will," plaintiff could have justifiably believed otherwise based on other provisions in the code). However, in this case, the Code and Handbook contain no mention of just–cause employment. The Handbook and Code clearly and unambiguously explain that the employment arrangement was considered at–will and terminable at any time, by either party. Because courts have found for employees under the *Toussaint* legitimate expectation theory in similar circumstances, however, Nash's claim was not wholly frivolous. Accordingly, the portion of Cash Advance's motion seeking Rule 11 sanctions will be denied.

V

Accordingly, it is **ORDERED** that Cash Advance's motion to dismiss, ECF No. 4, is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that Nash's complaint, ECF No. 1, is **DISMISSED** with prejudice. This is a final order and closes the case.

Dated: July 17, 2014               s/Thomas L. Ludington
                                   THOMAS L. LUDINGTON
                                   United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 17, 2014.

s/Tracy A. Jacobs<br>TRACY A. JACOBS